# Exhibit
# 1

# STATE OF NORTH CAROLINA

MECKLENBURG County

In The General Court Of Justice
☐ District ☒ Superior Court Division

**Name Of Plaintiff**
LIFE BUTTER, LLC

**Address**
1009 East Blvd.

**City, State, Zip**
Charlotte NC 28203

**CIVIL SUMMONS**

☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

**VERSUS**

**Name Of Defendant(s)**
BPI EQUIPMENT INC.

**Date Original Summons Issued**

**Date(s) Subsequent Summons(es) Issued**

## To Each Of The Defendant(s) Named Below:

**Name And Address Of Defendant 1**
BPI EQUIPMENT INC.
c/o Ronald Colpitts, Registered Agent
12655 Sandy Dr., STE D.
Granger IN 46545

**Name And Address Of Defendant 2**

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

**Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)**
Kyle L. Putnam
Hull & Chandler, P.A.
1009 East Blvd.
Charlotte NC 28203

**Date Issued** 5/24/2024

**Time** 4:03:06 pm ☐ AM ☐ PM

**Signature** /s/ M. Woodard

☐ Deputy CSC ☒ Assistant CSC ☐ Clerk Of Superior Court

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

**Date Of Endorsement**

**Time** ☐ AM ☐ PM

**Signature**

☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

| RETURN OF SERVICE |
|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: (type or print name) | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: (type or print name) | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid<br>$ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

MECKLENBURG **County**

*File No.* 24CV023988-590

In The General Court Of Justice
☐ District ☒ Superior Court Division

**Name And Address Of Plaintiff 1**
LIFE BUTTER, LLC
c/o Hull & Chandler, P.A.
1009 East Blvd.
Charlotte                    NC        28203

**Name And Address Of Plaintiff 2**

# GENERAL
# CIVIL ACTION COVER SHEET

☒ INITIAL FILING    ☐ SUBSEQUENT FILING

*Rule 5(b) of the General Rules of Practice for the Superior and District Courts*

## VERSUS

**Name And Address Of Defendant 1**
BPI EQUIPMENT INC.
c/o Ronald Colpitts, Registered Agent
12655 Sandy Dr., STE D.
Granger                     IN        46545

**Summons Submitted**
☒ Yes    ☐ No

**Name And Address Of Defendant 2**

**Summons Submitted**
☐ Yes    ☐ No

**Name And Address Of Attorney Or Party, If Not Represented**
*(complete for initial appearance or change of address)*
Kyle L. Putnam
Hull & Chandler, P.A.
1009 East Blvd.
Charlotte                    NC        28203

| Telephone No. | Cellular Telephone No. |
|---|---|
| 704-375-8488 | |

| NC Attorney Bar No. | Attorney Email Address |
|---|---|
| 56382 | kputnam@lawyercarolina.com |

☒ Initial Appearance in Case    ☐ Change of Address

| Name Of Firm | Fax No. |
|---|---|
| Hull & Chandler, P.A. | |

**Counsel For**
☒ All Plaintiffs    ☐ All Defendants    ☐ Only: *(list party(ies) represented)*

☒ Jury Demanded In Pleading    ☐ Complex Litigation    ☐ Stipulate to Arbitration

## TYPE OF PLEADING

*(check all that apply)*

☐ Amend (AMND)
☐ Amended Answer/Reply (AMND-Response)
☐ Amended Complaint (AMND)
☐ Assess Costs (COST)
☐ Answer/Reply (ANSW-Response) *(see Note)*
☐ Change Venue (CHVN)
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL)
☐ Contempt (CNTP)
☐ Continue (CNTN)
☐ Compel (CMPL)
☐ Counterclaim (CTCL) *Assess Court Costs*
☐ Crossclaim (list on back) (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD)
☐ Extend Statute Of Limitations, Rule 9 (ESOL)
☐ Extend Time For Complaint (EXCO)
☐ Failure To Join Necessary Party (FJNP)

☐ Failure To State A Claim (FASC)
☐ Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
☐ Improper Venue/Division (IMVN)
☐ Including Attorney's Fees (ATTY)
☐ Intervene (INTR)
☐ Interplead (INTP)
☐ Lack Of Jurisdiction (Person) (LJPN)
☐ Lack Of Jurisdiction (Subject Matter) (LJSM)
☐ Modification Of Child Support In IV-D Actions (MSUP)
☐ Notice Of Dismissal With Or Without Prejudice (VOLD)
☐ Petition To Sue As Indigent (OTHR)
☐ Rule 12 Motion In Lieu Of Answer (MDLA)
☐ Sanctions (SANC)
☐ Set Aside (OTHR)
☐ Show Cause (SHOW)
☐ Transfer (TRFR)
☐ Third Party Complaint *(list Third Party Defendants on back)* (TPCL)
☐ Vacate/Modify Judgment (VCMD)
☐ Withdraw As Counsel (WDCN)
☐ Other *(specify and list each separately)*

**NOTE:** *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must include either a General Civil (AOC-CV-751), Motion (AOC-CV-752), or Court Action (AOC-CV-753) cover sheet.*

*(Over)*

| | CLAIMS FOR RELIEF | |
|---|---|---|

☐ Administrative Appeal (ADMA)
☐ Appointment Of Receiver (APRC)
☐ Attachment/Garnishment (ATTC)
☐ Claim And Delivery (CLMD)
☐ Collection On Account (ACCT)
☐ Condemnation (CNDM)
☐ Contract (CNTR)
☐ Discovery Scheduling Order (DSCH)
☐ Injunction (INJU)

☐ Limited Driving Privilege - Out-Of-State
   Convictions (PLDP)
☐ Medical Malpractice (MDML)
☐ Minor Settlement (MSTL)
☒ Money Owed (MNYO)
☐ Negligence - Motor Vehicle (MVNG)
☐ Negligence - Other (NEGO)
☐ Motor Vehicle Lien G.S. Chapter 44A (MVLN)
☐ Possession Of Personal Property (POPP)

☐ Product Liability (PROD)
☐ Real Property (RLPR)
☐ Specific Performance (SPPR)
☐ Other *(specify and list each separately)*

| Date | Signature Of Attorney/Party |
|---|---|
| 05/24/2024 | |

**FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Foreclosure) (RSOT)
Supplemental Procedures (SUPR)

**PRO HAC VICE FEES APPLY**
Motion For Out-Of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out-Of-State Attorney/Pro Hac Vice Fee)

| No. | ☐ Additional Plaintiff(s) | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| No. | ☐ Additional Defendant(s) | ☐ Third Party Defendant(s) | Summons Submitted |
|---|---|---|---|
| | | | ☐ Yes ☐ No |
| | | | ☐ Yes ☐ No |
| | | | ☐ Yes ☐ No |
| | | | ☐ Yes ☐ No |
| | | | ☐ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE |
| | | SUPERIOR COURT DIVISION |
| COUNTY OF MECKLENBURG | | FILE NO.: |

**LIFE BUTTER, LLC**                )
                                                    )
                                                    )
                                                    )
                        Plaintiffs,        )                **COMPLAINT**
v.                                                 )        **(Jury Trial Demanded)**
                                                    )
**BPI EQUIPMENT, INC.**            )
                                                    )
                        Defendant.        )
_____

      **NOW COMES** the Plaintiff, LIFE BUTTER, LLC, by and through undersigned counsel, complaining of the Defendant, BPI EQUIPMENT, INC., and hereby does allege the following:

## PARTIES AND JURISDICTION

1. Plaintiff is a North Carolina Limited Liability Company that maintains a principal office located at 445 South Main St., Suite 300, Davidson, NC 28036.

2. Upon information and belief, Defendant is an Indiana Corporation, with a principal office located at 12655 Sandy Dr., Granger, Indiana 46530.

3. The nature of this dispute arises out of and relates to an agreement (the "Agreement"), a copy of which is attached hereto as "EXHIBIT A", for the purchase and sale of an ST100 Die Cut Bagger (the "Machine").

4. The Agreement was initially between Defendant and Abby's Better, Inc., a Delaware corporation ("Abby's").

5. On or about March 1, 2024, Abby's conveyed, assigned, and transferred its rights, title, and interest in the Machine to Plaintiff; Plaintiff stands in the shoes of Abby's and maintains standing to bring this action.

6. The Agreement contains a clause stating that "The Courts of St. Joseph County Indiana will have jurisdiction to entertain and determine all disputes and claims . . . arising out of or in any way connected with . . . [the] Contract . . .".

7. However, said clause does not provide that the courts of St. Joseph County maintain exclusive jurisdiction to adjudicate this matter. Therefore, Plaintiff brings forth this action before the courts of Mecklenburg County, North Carolina.

8. This court maintains subject matter jurisdiction over this matter.

9. This court maintains personal jurisdiction over the parties.

10. This court remains a proper venue.

## STATEMENT OF THE FACTS

### The Agreement

11. The allegations contained in Paragraphs 1-10 are realleged and incorporated by reference herein.

12. Abby's was engaged in the business of, without limitation, manufacturing and producing all natural snacks for consumer consumption.

13. Upon information and belief, Defendant is engaged in the business of designing, providing, maintaining, and servicing industrial packaging equipment to commercial customers.

14. In 2022, Abby's desired to increase its product line through the large-scale production of nut butter contained in individual squeeze packs.

15. The squeeze packs were designed to be relatively small in size and held in hand. The squeeze pack contained a removable lining where individuals could thereafter "squeeze" various flavors nut butter out of its packaging for direct consumption.

16. For the purpose of producing squeeze packs filled with nut butter on an extensive scale for public consumption, in 2022, Abbys solicited Defendant to build, design, manufacture, and supply a machine that would be capable of producing such.

17. Thereafter, and in full recognition and acknowledgment of Abby's' needs, Defendant represented to Abby's that it could, in fact, furnish such a machine, with the Machine accomplishing Abby's needs and expectations.

18. On or about December 19, 2022, Abbys and Defendant entered into the Agreement for the purchase of the Machine, whereby *inter alia*, Defendant was to provide and furnish to Abbys the Machine and Abbys was to compensate Defendant.

19. The purchase price of the Machine, without including the costs of installation and training by Defendant, was in excess of $25,000.00.

20. The Agreement contains a "Scope of project" provision, which specifically states, "To package die-cut shaped sachets filled with nut butter".

21. The Agreement contains a section representing various "Technical Advantages" of the Machine, including, without limitation:

    a.  Electric photo eye film registration; and

    b.  Runs most common film structures; and

    c.  Minimal maintenance with easy operations; and

    d.  Die cut bag capability.

22. The Agreement contains a section representing "Technical Specifications" of the Machine, including, without limitation:

    a.  That the Machine can process bags of a width between 15mm-80mm and a length of 50mm-150mm; and

    b.  That the jaw cycle speed of the machine can produce up to sixty (60) bags per minute (depending on product, film, and bag size).

23. The Agreement further incorporates certain Terms and Conditions, which were made part of the Agreement and agreed to by Abby's and Defendant.

24. Section 8 of the Terms and Conditions contains a warranty for manufactured parts of the machine. The warranty states, without limitation:

    a.  That that the "manufactured parts are warranted for a period of 12 (twelve) months from shipment or 2000 (two thousand) hours of use, whichever comes first . . ." and;

    b.  If a part that is returned is "found to be defective and the warranty applies, the price of the replacement part that was purchased will be credited."

25. Section 10(e) of the Terms and Conditions further acknowledges that "[Abby's] is purchasing specialized goods that have been manufactured in part specifically for [Abby's]".

**Issues with the Machine**

26. The Machine is comprised of stainless steel and its base sits at approximately five (5) feet tall.

27. The Machine contains a filler in which to place nut butter product, which is operated by a computerized motor.

28. From the filler, the nut butter product is supposed to be pumped through a nozel and disbursed into squeeze pack bags that are inputted into the Machine.

29. The Machine utilizes roll stock film for the purpose of pulling packaging into a forming assembly, which is supposed to form each bag into a tuxedo fashion.

30. The Machine utilizes eye marks on each bag and once the bag is formed and nut butter product disbursed within, the Machine is supposed to seal the bag shut and hold nut butter without leakage.

31. If one step in the Machine's process is not performed or otherwise hindered, the causal chain for such production of squeeze packs filled with nut butter fails as a whole.

32. The Machine contains various deficiencies and does not remain functional as intended under the Agreement. Such deficiencies include, without limitation:

   a. The Machine fails to consistently fold squeeze pack bags, with such squeeze packs often becoming deformed or not folded in a tuxedo fashion.

   b. The Machine fails to consistently seal squeeze pack bags, with the Machine often ripping or tearing such bags, causing nut butter to spew and leak.

   c. The Machine's sensors do not accurately read or register eye marks on the squeeze pack bags, which often causes the Machine to compile multiple squeeze pack bags together as one unit.

   d. The parts comprising the Machine remain unstable and loose; such parts often become stuck upon each other and even cause the squeeze pack bags to become wedged inside the Machine.

   e. The Machine fails to consistently run autonomously and requires constant supervision and support in order to produce mere nominal amounts of product.

   f. The Machine's computer system contains various functions and parameter settings that fail to make necessary adjustments or otherwise render a material effect on the Machine's performance.

33. To date, the Machine has never been able to run or produce product for a full day; the Machine, at best, has only operated for hours at a time, with such operation requiring constant supervision, troubleshooting, and maintenance.

## The Assembly, Testing, and Installation of the Machine

34. Upon information and belief, in January of 2023, Defendant's engineers began engineering, building, and assembling the Machine.

35. In accordance with the Agreement, Abby's provided Defendant with product samples in order to ensure the Machine worked as intended and contemplated by Abby's and Defendant.

36. Such product samples consisted of, without limitation, squeeze pack bags that Abby's intended to produce on a mass scale, of which the Machine was intended to be utilized for, as contemplated by the Agreement.

37. Defendant remained aware of the nature and extent of these squeeze pack bags and acknowledged, approved, and represented to Abby's that the Machine could, in fact, utilize such bags.

38. On or about February 10, 2023, a representative from Abby's travelled to Defendant's headquarters to view the Machine in use and participate in product testing of the Machine.

39. While conducting such initial product testing, Abby's and Defendant spec'd the Machine to fit the identical product samples that Abby's furnished to Defendant.

40. Initially, the Machine appeared to run as intended. However, when the squeeze packaging was placed into the Machine, the Machine stopped working.

41. On or about February 27, 2023, a representative of Plaintiff travelled to Defendant's headquarters again to engage in product testing of the Machine.

42. During such testing, the Machine experienced further electrical issues and did not operate properly.

43. Due to such electrical issues, the product testing was tabled again for a later date.

44. Subsequently, Abby's and Defendant met again via Zoom to finish product testing.

45. At such time, Defendant represented to Abby's that the Machine worked properly, utilized the squeeze packs that Abby's provided, and could consistently generate the product Abby's desired, with Abby's justifiably relying on such representations.

46. On or about May 1, 2023, the Machine was delivered to Abby's manufacturing warehouse, located in North Carolina, and was placed into Abby's possession.

47. On or about May 10, 2023, a representative of Defendant travelled to North Carolina in order to set up, install, and train Abby's staff on the Machine's use.

48. From May 10, 2023, through May 12, 2023, Defendant attempted to render the Machine operational as intended by the Agreement.

49. However, throughout this three (3) day period, the Machine simply, did not work as intended:

    a. No extensive training occurred, as the Machine would not consistently operate.

    b. The substantial majority of the time during this period was used to troubleshoot and bring the Machine to a substandard working condition.

    c. Hundreds of squeeze packs were wasted, deformed, and rendered unusable.

50. The result of Defendant's first visit did not resolve the issues with the Machine; Defendant left North Carolina without the Machine being able to consistently function or remain operational.

51. As a result of the failed installation and training, Defendant represented to Abby's that it would re-schedule another time to address the issues in the Machine and ensure it properly worked on a later date.

52. On or about June 20, 2024, a representative of Defendant travelled again to North Carolina in order to set up, install, and train Abby's staff on the Machine's use.

53. At or around June 20, 2024, through June 22, 2024, Defendant attempted to render the Machine operational as intended by the Agreement.

54. However, again, throughout this three (3) day period, the Machine simply did not work:

    a. No extensive training occurred, as the Machine would not consistently operate.

    b. The substantial majority of the time during this period was used to troubleshoot and bring the Machine to a substandard working condition.

    c. Hundreds of squeeze packs were wasted, deformed, and rendered unusable.

55. The result of Defendant's second visit did not resolve the issues with the Machine; Defendant left North Carolina without the Machine being able to consistently function or remain operational.

56. On multiple occasions, even when the Machine did produce nominal amounts of squeeze packs, Abby's would later discover that such bags were not properly sealed, with the squeeze packs leaking and spewing nut butter product.

57. No part of the Machine was or is defective due to the fault of Abby's or Plaintiff.

58. To date, the Machine is wholly unusable, unsustainable, and simply does not work.

59. As a result of the actions and omissions of Defendant, Abby's, and therefore Plaintiff, has suffered damages in excess of $25,000.00, to be proven with more particularity at trial.

## FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT

60. The allegations contained in Paragraphs 1-59 are realleged and incorporated by reference herein.

61. Abby's and Defendant entered into the Agreement and such Agreement remains valid and enforceable.

62. Defendant breached the terms of the Agreement by, without limitation: failing to engineer, build, supply, furnish, and install a Machine that would consistently produce packaged die-cut sachets filled with nut butter, failing to provide adequate training for the use of the Machine, and failing to fix or otherwise remedy the defects within the Machine.

63. Abby's/Plaintiff substantially complied with its obligations under the Agreement. Namely, all payments due to Defendant under the Agreement were furnished, including without limitation, the purchase price of the Machine and trainings thereto.

64. The deficiencies in the Machine were not due to the operational error or fault of Abby's or Plaintiff.

65. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages in excess of $25,000.00, to be proven with more particularity at trial.

## SECOND CLAIM FOR RELIEF: BREACH OF WARRANTY

66. The allegations contained in Paragraphs 1-65 are realleged and incorporated by reference herein.

67. In accordance with the Agreement, Defendant manifested a warranty.

68. Specifically, Defendant expressly warranted that the "manufactured parts are warranted for a period of 12 (twelve) months from shipment or 2000 (two thousand) hours of use, whichever comes first . . ."

69. Abby's timely notified and made repeated demands under the warranty for Defendant to address the defects and workmanship of the Machine with Defendant failing to correct the deficiencies in the Machine.

70. Defendant breached the warranty by failing to correct and effectuate repairs to the manufactured parts of the Machine.

71. Defendant failed to remedy the defects and poor workmanship of the Machine upon the demands of Abby's; The Machine continuously fails to adequately package squeeze packs, spews/leaks nut butter product, produces substandard packaging, and fails to consistently produce marketable goods for consumer consumption.

72. Despite Defendant's failure to effectuate appropriate repairs under the terms of the warranty, Defendant has otherwise failed and refused to remedy the defects through other means, including refunding or replacing the Machine at Defendant's expense.

73. As a direct and proximate result of Defendant's breach of warranty, Plaintiff has suffered damages in an amount in excess of $25,000.00, to be proven with more particularity at trial.

## THIRD CLAIM FOR RELIEF:
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

74. The allegations contained in Paragraphs 1-73 are realleged and incorporated by reference herein.

75. Section 8 of the Terms and Conditions of the Agreement contains a provision purportedly disclaiming the implied warranty of merchantability: "The Seller makes no warranty, implied, and/or expressed, of merchantability . . ." (the "Merchantability Disclaimer")

76. However, the Merchantability Disclaimer remains inconspicuous: there is no header in all capitals equal to or greater in size than the surrounding text, or in contrasting type, font or color to the surrounding text of the same or lesser size immediately preceding the Merchantability Disclaimer. The Merchantability Disclaimer is printed in lowercase letters. The Merchantability Disclaimer is furthermore not in a larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols, or other marks that call attention to such language. Therefore, Plaintiff brings this claim for breach of the implied warranty of merchantability.

77. Upon information and belief, at the time Defendant was solicited by Abby's, negotiated the specifications of the Machine with Abby's, sold/furnished the Machine to Abby's, and at all other times material, Defendant was a merchant that frequently dealt with the building, designing, and assembling of packaging machine equipment and other merchandise similar to the Machine.

78. Defendant held itself out to Abby's as having knowledge or skill peculiar to the practice of the building, designing, supplying, and installing of commercial packaging machinery.

79. Defendant held the Machine out to Abby's as merchantable for the ordinary purpose the Machine is used for, including without limitation, that the Machine would be able to manufacture and produce, on a large scale, marketable squeeze packs with precision, accuracy, and without spillage.

80. Upon information and belief, Defendant, in the regular course of its business, supplies, assembles, designs, manufactures, engineers, and delivers similar machines that are capable of the performance and accuracy expected of the Machine in this matter.

81. Defendant breached the implied warranty of merchantability by, without limitation:

   a. The Machine was not sufficient to pass without objection in the trade under the bargained-for contract description, as, without limitation, the Machine is incapable of consistently producing die-cut sachets filled with nut butter; and

   b. The Machine was not of fair average quality within the bargained-for contract description, as, without limitation, the Machine is incapable of consistently producing die-cut sachets filled with nut butter; and

   c. The Machine was not fit for its ordinary purpose: to consistently produce die-cut sachets filled with nut butter.

82. To date, the Machine is unable to be utilized for the purpose as contemplated and bargained-for due to its unmerchantability.

83. But for Defendant's breach of the implied warranty of merchantability, Plaintiff would not have suffered damages.

84. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff has suffered damages in excess of $25,000.00, to be proven with more particularity at trial.

**FOURTH CLAIM FOR RELIEF:**
**BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**

85. The allegations contained in Paragraphs 1-84 are realleged and incorporated herein by reference.

86. Section 8 of the Terms and Conditions of the Agreement contains a provision purportedly disclaiming the implied warranty of fitness for a particular purpose: " The Seller makes no warranty, implied, and/or expressed, . . . fitness for any particular purpose . . ." (the "Particular Purpose Disclaimer").

87. However, the Particular Purpose Disclaimer remains inconspicuous: there is no header in all capitals equal to or greater in size than the surrounding text, or in contrasting type,

font or color to the surrounding text of the same or lesser size immediately preceding the Particular Purpose Disclaimer. The Particular Purpose Disclaimer is printed in lowercase letters. The Particular Purpose Disclaimer is furthermore not in a larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size or set off from the surrounding text of the same size by symbols, or other marks that call attention to such language. Therefore, Plaintiff brings this claim for breach of implied warranty of fitness for a particular purpose.

88. At the time of contracting, Defendant had reason to know that Abby's was relying on Defendant's skill and judgment to create, select, assemble, engineer, manufacture, and furnish a suitable Machine for the particular purposes Abby's expressed to Defendant.

89. Such particular purposes include, without limitation, high-end and specialized packaging of sealed bags containing nut butter for sale.

90. Abby's did in fact rely on the representations of Defendant and the Agreement, and purchased the Machine with the reasonable expectation that the Machine would meet the specifications and requirements the Parties agreed upon.

91. Defendant did not furnish the Machine "AS IS".

92. Defendant impliedly warranted to Abby's that the Machine was fit for Abby's particular purpose, despite the Machine failing to consistently and properly manufacture and generate sealed bags containing nut butter.

93. Defendant breached the implied warranty of fitness for a particular purpose by designing, constructing, manufacturing, delivering, and installing the Machine that was not fit for Abby's particular purposes.

94. Defendant understood through its correspondence and discussions with Abby's that the Machine was being used for a particular purpose.

95. But for Defendant's breach of the implied warranty of fitness for a particular purpose, Plaintiff would not have suffered damages.

96. As a direct and proximate cause of Defendant's breach of the implied warranty of fitness for a particular purpose, Plaintiff has suffered damages in an amount in excess of $25,000.00, to be proven with more particularity at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully pray the Court for the following relief:

1. That Plaintiff have and recover from Defendant a sum in excess of $25,000.00 pursuant to Plaintiff's first claim for relief for breach of contract.

2. That Plaintiff have and recover from Defendant a sum in excess of $25,000.00 pursuant to Plaintiff's second claim for relief for breach of warranty.

3. That Plaintiff have and recover from Defendant a sum in excess of $25,000.00 pursuant to Plaintiff's third claim for relief for breach of the implied warranty of merchantability.

4. That Plaintiff have and recover from Defendant a sum in excess of $25,000.00 pursuant to Plaintiff's fourth claim for relief for breach of the implied warranty of fitness for a particular purpose.

5. That Defendant be taxed with the costs of this action.

6. That a jury trial be had on all matters pled herein.

7. For such other and further relief as the court may deem fit, just, and proper.

This the 24 day of May, 2024.

**HULL & CHANDLER, P.A.**

Kyle L. Putnam
N.C. Bar No. 56382
1009 East Blvd.
Charlotte, NC 28203
T: 704 – 375 – 8488
kputnam@lawyercarolina.com
*Attorney for Plaintiff*

EXHIBIT
A



## PACKAGING TECHNOLOGIES

12655 Sandy Drive | Granger, IN 46530





**Abby's Better Inc**
6431 Reams Rd, Suite D Dock 11
Charlotte, NC 28216
Attn: Aaron Kircher
407-325-9180
aaron@abbysbetter.com

Date: 12/14/22

Thank you for considering BPI Packaging Equipment, Inc. for your project. We are confident you will find that our comprehensive services will satisfy your packaging requirements for your

## Scope of project:

**To package die-cut shaped sachets filled with nut butter**

.

The enclosed proposal will help you accomplish your equipment goals if any adjustments need to be made, we can evaluate these needs to help you achieve your equipment requirements which will utilize the most of our services. Please reach out to us if you have any questions. Thank you for choosing BPI Packaging Equipment, Inc.

## ST100 Single Lane Die Cut Bagger

### Technical Advantages

- 304 Stainless steel construction
- Servo motor drive film delivery system
- Siemens large color HMI touch screen
- Easy adjustable vertical seal controls
- Electric photo eye film registration
- Siemens control platform & components
- Runs most common film structures
- Auto stop end of film shut down device
- Quick change film splice table
- Quickly change from liquid to powder products
- Minimal maintenance with easy operations
- Die cut bag capability

### ST100 Bagger Die Cut



| Total Price for ST100 Die Cut Bagger | **$Included** |
|---|---|

## Technical Specifications

- **Bag Style:** Single Lane stick-pack
- **Bag Width Range:** 15mm-80mm | 0.6-3.1"
- **Bag Length Range:** 50mm-150mm | 2.0-5.9"
- **Seal Width:** Top seal 6-10mm | Bottom seal 6-10mm | Back seal 3-8mm
- **Maximum Web Width:** 180mm || 7.1"
- **Jaw Style:** Resistance sealing system with horizontal serrations
- **Jaw Cycle Speed:** Up to 60 Bags/Min (depending on product, film, and bag size)
- **Please Note:** Product samples are needed to determine **a)** packaging speeds **b)** if the product will run properly using auger filler, multi head scale, piston filler, volumetric filler, linear filer, or other types of filling and weighing system. Furthermore, final packaging speed depends upon output from the filler, the product feed system to the filler, actual product, actual product condition, product free flow ability, packaging material, final packaging size and operator skill. BPI assumes the bags are size to preclude bridging in the forming tube assembly, funnel, and chutes. BPI reserves the right to review this proposal if changes to these specifications are submitted by purchaser or determined by product testing. Changes to specifications may affect price and delivery time.
- **Machine Construction:** Stainless steel and hard anodized or clear aluminum, no paint unless noted.
- **Electrical Requirements:** 220v/20amp Single Phase (Equipment meets CE requirements)
- **Pneumatic Requirements:** 8 – 15CFM at 90PSI of clean dry air (supplied by customer)

## Bagger Options:

- Additional Die cut seal jaws for different size bags (based on customers current bag)  $ 9,500
- Additional Forming tube assembly's (at time of purchase only)  $ 3,600
- Recommended spare parts kit (wear parts)  **$ Included**

Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 18 of 26

| This Bagger is Set up for this bag size | This Bagger is Set up for side Fin seal |
|---|---|
|  |  |

## Examples of Die Cut Bags



| **Total Price for Printing System** | **$Included** |
|---|---|

### UNO -TIJ PRINTER – SINGLE-HEAD: LIFETIME WARRANTY

**To print multiple lines of text in either direction up to ½" tall**
(Includes printer mounting bracket)



Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 19 of 26

## GP100 Lobe Pump Filler System

### Technical Specifications:

- High quality 304 stainless steel contact surfaces
- Filling weighments from 30-100ml
- Quick and easy adjustment for fill rates
- Easy to clean with very low maintenance
- Disassembly for cleaning with minimal parts
- Minimal maintenance and ease of operation
- Compact footprint for easy mounting
- Dispensing accuracies of up to ±1-2% or better

### GP Series Pump



| Total Price for GP100 Series Pump System | $Included |
|---|---|

### GP100 Pump Options:

- 25 Liter Stainless Steel Hopper (Heated Jacket) — $4,275
- 25 Liter Stainless Steel Hopper (Non Heated) — $Included
- Tube assembly for VFFS bagger with nozzle control for thick product — $Included
- Tube assembly for VFFS bagger with nozzle control for semi smooth product — $Included

### Take-Away Conveyor: $6,800



Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 20 of 26

# Pricing Summary

## Price of all highlighted components: $95,075

## (installation & training not included)

# PAYMENT TERMS

1) Down payment of 60% of the total shall be due upon receipt of this signed quotation. No order shall be entered until receipt of down payment and this signed quotation is returned to BPI Equipment.

2) After receipt of signed quotation and down payment customer agrees to send all product samples, product descriptions product weights, film samples, full film roll or required number of premade bags to BPI within seven (7) business days, If items are not received with in the stated time BPI may at its discretion place order on hold until items are received.

3) Second payment of 40% of the total shall be due 30 days prior to completion.

4) All prices quoted are *[FCA (Granger, Indiana)]* unless otherwise noted. All duties, tariffs, sales taxes, value-added taxes, and any other taxes levied on the order are borne by the customer.

5) All sales are subject to the attached "TERMS AND CONDITIONS."

# DELIVERY

The current lead-time on the above quoted equipment is **90 days ex-factory** . Lead-time could be changed depending upon the number of other orders received prior to placement of this order. Projected date of shipment to be determined upon receipt of order confirmation & required down payment.

# GUARANTEE

Described in Item #6 of the attached *TERMS AND CONDITIONS*
**THIS QUOTATION IS VALID FOR THIRTY (30) DAYS**

If you are in agreement with the terms of this quotation, please sign below. Once signed and accepted, both parties agree to abide by the terms and conditions of this quotation.

**BPI Equipment Inc.**

*Dion Volk*
**VP of Sales**

**12/14/ 2022**

**Purchaser's Acceptance:**

Aaron Kircher
**By**

COO
**Title**

12/19/22
**Date**

Quote No. Q22-193c

Page **5** of **10**

Die-cut sachet

# TERMS AND CONDITIONS

1. **Definitions.** Terms not otherwise defined in these Terms and Conditions ("Terms and Conditions") will be as defined in the attached Purchase Order (defined below) to which these Terms and Conditions are attached and made a part thereof. Terms not otherwise defined in these Terms and Conditions or the Purchase Order will be as defined in the uniform commercial code of the State of Indiana, Indiana Statutes.
   a. "**Seller**" means BPI Equipment, Inc., an Indiana company, located and doing business in Granger, Indiana.
   b. "**Buyer**" means the person or entity on whose behalf a signature appears on the attached Purchased Order, and its affiliates, successors, and assignees.
   c. "**Purchase Order**" means the attached document describing the Equipment (defined below) offered to be sold by Seller to Buyer on the terms and conditions set forth therein including, but not limited to, the Purchase Price (defined below), the payment terms, the shipping terms, the Commissioning, the training and/or the service related thereto, prior to being signed by both Seller and Buyer.
   d. "**Contract**" means the Purchase Order as signed by Seller and Buyer, which includes these Terms and Conditions and constitutes a binding agreement relating to the sale of Equipment by Seller to Buyer.
   e. "**Equipment**" means the goods identified in the Purchase Order sold subject to the terms of the Contract.
   f. "**Delivery**" means the voluntary transfer of possession of the Equipment by Seller to Buyer, free on board (f.o.b.) origin, Manufacturer's Facility.
   g. "**Delivery Date**" means the date identified in the Purchase Order as the date Seller agrees to use its reasonably commercial efforts to effect Delivery of the Equipment, except that with respect to the Delivery Date, time will not be deemed to be of the essence.
   h. "**Force Majeure**" means any cause or event beyond the reasonable control of Seller such as, but not limited to, war, riots, acts of God or public enemy, fire, explosion, flood, earthquake, strike, lockout or other labor disturbance, embargo, actions of any governmental authority, interruptions or delay in transportation, or delay or failure of usual carriers, supplies or original equipment manufacturers other than Seller.
   i. "**Purchase Price**" means the cost of the Equipment charged by Seller to Buyer and due from Buyer to Seller including all costs of packing and making Delivery of the Equipment from Seller to Buyer (f.o.b. origin, Manufacturer's Facility, freight collect), all Taxes and the cost of filing any lien or financing or termination statement with respect to Seller's security interest in the Equipment.
   j. "**Taxes**" means all applicable taxes levied, imposed or claimed as owing by a governmental body as result of the sale of the Equipment from Seller to Buyer including sales, use and excise taxes and other duties or assessments, and excluding taxes relating to the income of Seller.

2. **Performance**
   a. **In General.** Each separate Delivery of Equipment under this Contract will be deemed a separate sale with the obligation of Buyer to pay Seller therefore without regard to the ordering or Delivery of any other Equipment pursuant to this Contract or any other agreement between Seller and Buyer. Seller will not be liable for the delay in or failure to make any Delivery of Equipment where such delay or failure is caused by or resulting from Force Majeure. No event of Force Majeure, however, will relieve Buyer from making payment hereunder when and as due. Seller will promptly notify Buyer of each of Seller's Delivery of Equipment. Title to and the risk of loss of the Equipment will pass from Seller to Buyer upon completion of Delivery. Upon receipt of the Equipment, Buyer will promptly inspect the Equipment and promptly notify Seller of any defects herein.
   b. **Custom Equipment and Change Orders.** If the Equipment is unique in design or function according to the Buyer's specifications (in addition to the range of choices indicated for the Equipment offered by Seller generally to all buyers), in addition to the provisions set forth in subparagraph 2.a. above, failure of Seller to effect Delivery of the Equipment in good faith by the Delivery Date will not be a breach of the Contract by Seller and will not excuse Buyer's performance thereunder. Instead, Buyer and Seller will cooperate as necessary to achieve Seller's performance under the Contract. All changes, additions, alterations, deviations, or extras to the Equipment requested by Buyer subsequent to the date of the Contract will constitute a "Change Order" and Seller will specify the additional amount to be paid therefore by Buyer and the change, if any, in the time of Delivery, and each Change Order will be incorporated as part of the Contract.
   c. **Samples and Testing.** The Seller may at its discretion require product samples, packaging materials, and/or film samples of the items the Buyer intends to weigh, fill, or package using the Product(s) within 4 (four) weeks of the anticipated shipping date of the Product(s). In the event that the Buyer requests the Product(s) be shipped before the product samples, packaging materials, and/or film samples have been tested with the Product(s), the Buyer will bear all costs and liability related to any in the field modifications or changes required to the Product(s). All samples must be marked with the Buyer's name and shipped prepaid to: *BPI Equipment, Inc., 12655 Sandy Drive, Granger, Indiana, 46530.* Late arrival of all the samples described in this section c., packaging materials and/or film may also delay the shipment of the Product(s). The Seller recommends the Buyer to visit, witness, and accept the Product(s). In the event the Buyer doesn't supply the Seller with packaging materials and/or film prior to shipment for testing; the Seller will test the Product(s) using substitute packaging materials and/or film. In consequence, the Seller reserves the right to require that all balances due on the Product(s) be paid in full prior to shipment.

3. **Sales Offer** If an order based upon the Sales Offer is accepted by the Seller, it is agreed that the order shall be subject to the terms and conditions set forth below, all of which supersede all pre-printed and boilerplate terms and conditions set forth in any purchase order issued by the Buyer. In the event the Seller's Sales Offer ("Sales Offer") is not signed and dated by the Buyer, the remittance of a purchase order by the Buyer shall be deemed as the acceptance of this Agreement. In event of a conflict between this Agreement and a purchase order issued by the Buyer, the terms and conditions of this Agreement will prevail.

4. **Payment of Purchase Price** The Purchase Price for the Equipment due from Buyer to Seller will be paid to Seller at its offices in Granger, Indiana at the times and in the amounts (percentages) set forth in the Purchase Order in cash or otherwise immediately available funds in U.S. Dollars.

Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 22 of 26

5. **Payment.** Buyer will timely make all payments required by the Contract. Time is of the essence at all terms of payment. Payments not received by Seller within the five (5) days as agreed to hereunder will be considered delinquent and will accrue service charge fees of the lower of 1.5% per month (18% per year) or the highest rate allowed by law on all past due amounts, plus all costs and expenses incurred by Seller as a result of collection efforts including but not limited to reasonable attorneys' fees. The failure of Buyer to make proper payment when due will, in addition, to all other rights, entitle Seller in its sole discretion to suspend or recall any shipment of any Equipment, to suspend all warranty obligations under the Contract until all payments due are made, and/or to terminate the Contract in its entirety.

6. **Taxes.** Buyer agrees to pay all Taxes whatsoever due as a result of the sale of the Equipment from Seller to Buyer, and to indemnify Seller against the liability for the payment of all such Taxes, whenever claimed to be due. Seller in its sole discretion may include as part of the Purchase Price an amount for Taxes unless Buyer furnishes to Seller copies of all applicable certificates of exemption therefrom. If the Purchase Price includes an amount paid by Seller for any Taxes which Buyer believes in good faith not to be due or owing by Seller or Buyer (e.g., because of an applicable exemption or exception), Seller will comply with the reasonable requests of Buyer in any effort it may undertake to obtain a refund of the Taxes paid by Seller, including by supplying copies of all relevant documentation possessed by Seller. Nothing herein will relieve Buyer of the obligation to pay the total Purchase Price at the time(s) and in the amount(s) agreed to in this Contract without setoff or deduction for any Taxes paid by Seller. Seller will assign its right, title, and interest in all such refunds of Taxes paid on behalf of Buyer which are later determined not to be due or owing, and Seller will pay to Buyer all Taxes paid on behalf of Buyer which are refunded to Seller.

7. **Delivery.** It is the Buyer's responsibility to inspect and accept the Product(s) at the time and place of delivery. All prices for the Product(s) are FCA Origin, therefore, title and risk of loss and/or damage will pass to the Buyer upon delivery to the carrier at Seller's facility; therefor, should any damage result from transportation, the Buyer's sole recourse shall be against the freight carrier. Delivery schedules are based upon current production capacities, material, or component availability and inventory. The Seller is not liable in any way and for any reason for any delay in delivering of the Product(s). If delivery is suspended pursuant to the Buyer's actions, omissions, or instructions, the Buyer agrees to pay the Product(s) in full and/or any additional expenses incurred by the Seller, including storage. Product(s) may require field debugging and/or modifications due to factors beyond the Seller's control. Situations such as, but not limited to, insufficient real time testing prior to shipping, rough handling during transport, integrating onto auxiliary Product(s), upstream and downstream processes, production environments and/or untrained staff may cause the Product(s) to malfunction and operate inefficiently and/or not operate or produce as efficient, or as expected, or as intended by the Buyer.

8. **Warranty.** The Seller manufactured parts are warranted for a period of 12 (twelve) months from shipment or 2000 (two thousand) hours of use, whichever comes first, provided defects and/or failed results are from normal use of the Product(s). Nonfunctioning or defective parts must be returned prepaid to the Seller for evaluation. If a replacement part is requested before the Seller receives and evaluates the returned part, the new part must be purchased. If the part returned is found to be defective and the warranty applies, the price of the replacement part that was purchased will be credited. If the part is found to be defective due to operator error, abuse or neglect, or if Product(s) has been altered or modified without the Seller's prior written approval, then the replacement part supplied will not be covered by warranty and will not be credited. All freight charges for parts or Product(s) are the responsibility of the Buyer. Excluded from this warranty are parts such as load cells, sealing bands, belts, knives, jaws, hole punches, heating elements, thermocouples, suction cups and any part deemed to be a worn part and/or consumable. The Buyer is also responsible for using the appropriate materials and utensils when cleaning the Product(s). All parts not manufactured by the Seller are covered only by the original manufacturer guarantee; copies are available on request. Labor, travel costs, and living expenses are not covered by the warranty. The aforementioned warranty excludes the cost of removal or re-installation of the Product(s). The Seller does not warrant in any way the results on the use of, or attempts to use the Product(s), as the operation and efficiency of the Product(s) is very subjective and influenced by factors beyond the Seller's control including, but not limited to the operator's competence and working environment. The warranty contained hereby is expressly in lieu of (i) all other legal or conventional warranties, whether express or implied, and (ii) all other obligations or liabilities on the part of the Seller. It is the Buyer's obligation to pay in full all amounts due under this agreement and is absolute and unconditional under all circumstances and is not and will not be subject to abatement, reduction, or set-off for any reason. Any claim is to be handled according to the included warranty policy and not by withholding payment. The latter neither assumes nor authorizes any other person to vary the warranty or to assume for the Seller any other liability in connection with the sale of its Product(s). The Seller makes no warranty, implied, or expressed, of merchantability or fitness for any particular purpose other than the operating capabilities of the Product(s), it being understood and accepted by all parties hereto that the Seller's liability arising out of any defects in the Product(s) shall not exceed the cost of correcting any such defect or replacing the defective part, whichever is the least costly.

9. **Exercise of Warranty.** The above-stated warranty (except set forth in paragraph 8, may be exercised only in writing by Buyer giving notice to Seller within twenty-one (21) days subsequent to the Delivery Date, which notice specifies in detail the damage to or defect in the Equipment, and in the event Buyer has reason to believe that any damage has occurred in whole or in part during shipping, Buyer will also give notice to the carrier as may be required by any such carrier or insurer, and promptly provide a copy of same to Seller. The warranty set forth in paragraph 8 may be exercised only in writing by Buyer giving notice to Seller within ten (10) days subsequent to Buyer first becoming aware of a claim to which the warranty may apply. In the event Seller first becomes aware of a claim to which the warranty set forth in paragraph 8 may apply, Seller will promptly give Buyer notice of the claim.

10. **Buyer Representations and Acceptance.** In executing the Contract, Buyer represents that:
    a. Buyer has the necessary financial resources to fulfill its obligations under this Contract;
    b. Buyer has reviewed and approved this entire Contract before execution;
    c. Buyer has the legal authority to execute this Contract;
    d. Buyer agrees that the Equipment may be tendered by Seller in one or more Deliveries and the payment therefore may be apportioned and due for each such Delivery, and
    e. Buyer is purchasing specialized goods that have been manufactured in part specifically for Buyer and in the event Buyer fails to perform its obligations under this Contract, Seller cannot readily resell the Equipment to another buyer, and therefore Buyer agrees that it may not cancel this Contract and Seller may seek to enforce Buyer's specific performance of this Contract.

Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 23 of 26

11. **Security Interest in the Equipment.** Until paid in full for the Equipment including Taxes, Seller will have a security interest in the Equipment, and until Seller is paid in full, Buyer will not transfer the Equipment to any third party or suffer or allow any interest other than Sellers' security interest to attach to the Equipment including any lien or encumbrance. The existence of this Contract constitutes Buyer's consent to Seller's security interest in the Equipment and Buyer agrees not to contest Seller's security interest in the Equipment. By entering into this Contract Buyer hereby appoints Seller as its attorney-in-fact to execute and sign all documentation necessary in Seller's discretion to perfect Seller's security interest in the Equipment including any liens, financing statements and notices thereof. The lack or failure of Seller to make a filing or give notice of its security interest in the Equipment will not be evidence as between Seller and Buyer of the lack of a security interest or the intent of the parties to provide Seller a security interest in the Equipment.

12. **Reservation of Ownership.** The Seller reserves ownership of Product(s) until full and final payment of the sale price. The Buyer remains nonetheless fully responsible, including for acts of God, for the full value of the Product(s) during transport or while in Buyer's possession.

13. **Default/Cancellation.** In the event the Buyer fails to conclude this transaction for any reason or cause whatsoever, including but not limited to failure to make payment due on notice of delivery within a period of 45 (forty-five) days, the Seller shall have the right to cancel this transaction, keep and/or demand, and not limited to, as liquidated damages all monies received and/or due, repossess and/or resell the Product(s) without the Buyer having the right to claim compensation or claim of damages of any nature whatsoever and this including the demand for the return of any amounts deposited by the Buyer prior cancellation.
    a.   In addition, should the Buyer fail to remit the first deposit payment within 45 (forty-five) days of signing the contract, the Seller shall have the absolute right to cancel this transaction, and demand a minimum penalty of 25% of the amount of the transaction due immediately without the Buyer having the right to claim compensation or claim of damages of any nature whatsoever.

14. **Governing Law and Jurisdiction.** This contract will be governed by, construed and enforced in accordance with the laws of the State of Indiana, without giving effect to the rules respecting its conflicts of law principles. The courts of St. Joseph County Indiana will have jurisdiction to entertain and determine all disputes and claims both at law and in equity arising out of or in any way connected with the validity, existence, enforceability, construction, breach or alleged, threatened or anticipated breach of this Contract, to which the parties admit to having personal jurisdiction over them. Both parties waive rights to a jury trial.

15. **Notices.** All notices, demands, and payments required or permitted to be given under this Contract will be in writing and may be delivered personally, sent by email or overnight courier, or may be forwarded by first class prepaid mail to the address of Buyer sent forth in the Purchase Order and to Seller's address at:
**BPI Equipment Inc.**
**12655 Sandy Drive**
**Granger, IN 46530**

16. **Entire Agreement; Execution; Non-Assignability.** This Contract constitutes the entire agreement of the parties. It is expressly agreed that no statement, arrangement, warranty or understanding, oral or written, express or implied, will be recognized unless it is stated in or otherwise permitted by this Contract. To the extent a term or provision set forth in the Purchase Order differs from the same or like term or provision set forth in these Terms and Conditions, the meaning of the term or provision will be set forth in the Purchase Order. This Contract may be executed in any number of counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same document. Delivery of an executed copy of this Contract may be sent by any normally reliable means including electronically, facsimile or other method. This Contract is not assignable by Buyer without Seller's prior written consent.

17. **Enforceability; Non-waiver.** Any provision of the Agreement which may prove to be invalid, void or illegal will in no way affect, impair or invalidate any other provision hereof, and the remaining provisions hereof will nevertheless remain in full force and effect. No condoning, excusing, or waiver by either Seller or Buyer of any default, breach, or non-observance by the other party at any time in respect of any covenant, provision, or condition contained in this Contract will operate as a waiver of that party's rights hereunder in respect of any continuing or subsequent default, breach, or non-observance, and no waiver will be inferred from or implied by anything done or omitted to be done by the party having those rights. No warranty claim by Buyer in respect of any portion of the Equipment covered by this Contract voids or excuses Buyer's remaining obligations under the Contract.

Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 24 of 26

# BPI Commissioning, Service, & Training Rates

[Effective 01/01/2022]

| Activity | Hours | Rate / Hour |
|---|---|---|
| Travel Time | 8 Hours | $80.00 |
| Travel Overtime | Over 8 Hours<br>Anytime Saturday | $120.00 |
| Travel Double Time | Anytime Sunday & Anytime Holidays | $160.00 |

| Activity | Hours | Rate / Hour |
|---|---|---|
| In Plant Time | 8 Hours | $ 148.00 (8 Hour Minimum) |
| In Plant Time | Over 8 Hours<br>Anytime Saturday | $ 222.00 (8 Hour Minimum) |
| In Plant Double Time | Anytime Sunday & Anytime Holidays | $296.00 |

\* If an in-plant visit and travel occur on the same day, a minimum of 4 hours of service work will be billed in addition to the travel time.  For example, if the service technician does a final checkout on Saturday and the checkout takes less than 4 hours; you will be billed for 4 hours instead of 8 because travel time will also be billed.

| Activity | Hours | Rate / Hour |
|---|---|---|
| BPI Facility Training & Testing | Weekdays 8:00 am - 5:00 pm | $120.00 |
| IBPI Facility Training & Testing<br>Overtime<br>Overtime | Weekdays before 8:00 am<br>Weekdays after 5:00 pm<br>Anytime Saturday | $180.00 |
| In House Engineering | Weekdays 8:00 am - 5:00 pm ONLY | $240.00 |

| Activity | Hours | Rate / Hour |
|---|---|---|
| Airfare | Actual cost + 10% + any applicable change or baggage fees |
| Rental Car | Actual cost + 10% |
| Hotel | Actual cost + 10% |
| Mileage (Personal Car) | Current IRS rate + 10% |
| Per Diem (Meals & Incidentals) | 85.00 per day |
| Travel agency service fees | 35.00 per call |
| Miscellaneous | Actual cost + 10% |

*Revised: January 2022*

## Important Notes:

- Commissioning, service, and training is to be **scheduled through our office at (574) 307-1274 or Email:  Service@bpiequip.com**
- If a technician is unable to work during a weekday due to customer constraints but the customer requires the technician to remain in the area, a minimum of eight (8) hours In Plant Time will be charged
- If a technician is unable to work during a Saturday due to customer constraints but the customer requires the technician to remain in the area, a minimum of eight (8) hours In Plant Overtime will be charged.
- If a technician is unable to work during a Sunday or Holiday due to customer constraints but the customer requires the technician remain in the area, a minimum of eight (8) hours In Plant Double Time will be charged.
- We appreciate your help in scheduling ahead to minimize higher costs associated with short notice travel planning.
- BPI Equipment Inc. understands that our service teams have families and personal responsibilities. We therefore discourage weekend work and/or consecutive weekend work whenever possible.
- There will be no exceptions to the above commissioning rates unless a signed written change order agreed to by BPI management.

Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 25 of 26

# BPI Commissioning & Interfacing Policy

BPI, if requested by the customer, will provide a service technician for Commissioning of the quoted equipment as noted under the following **BPI Commissioning, Service, and Training Rates** (or actual rates in force at the time of Commissioning). The customer is to supply such skilled and casual labor as may be required to complete the work.

BPI, at its option and mutually agreed upon by both parties, may also provide interfacing with peripheral equipment not purchased from us. The cost of such interfacing is paid for by the customer at the rates in force under **BPI Commissioning, Service, and Training Rates**. We shall ultimately bear **no** responsibility for the operation/performance of equipment that has not been purchased through BPI.

Commissioning includes charges or adjustments required under sustained production conditions during the Commissioning period and initial training of your operators and/or maintenance personnel. We recommend that you consider additional training for your personnel. The service technician will provide additional training beyond completion of the Commissioning chargeable at our standard service rates.

Customer is required to provide actual product and packaging material when called for by the service technician for machine set-up and adjustments. If product and/or packaging material are not available, have not been submitted for prior approval when requested, or if product and/or packaging material have been changed, additional days of Commissioning may be required. Such days will be chargeable at our standard service rates.

Commissioning will be considered complete when all systems purchased from BPI perform per the Product Performance Specifications.

BPI shall in no way be liable for any losses, costs, forfeitures, damages, loss of profits, liabilities of the purchaser to its customers or third persons, and all other consequential damages, whether or not resulting from or contributed to by the default or negligence of, its agents, employees, and subcontractors, which might be claimed as a result of a service rendered.

**NOTE:**
The following preparations are not part of this agreement and are to be performed and completed by the customer prior to the arrival of the service technician.

• Receive, inspect, and unpack the equipment.
• If the equipment is received in damaged condition, file a claim with the carrier and notify BPI
  Per our Terms and Conditions of Sale.
• Position the equipment in its intended location making certain that the machine is located on
  Substantial footings and is properly leveled. Degrease and clean the equipment.
• Install necessary services such as power, air, and water.
• Have necessary packaging material and product available to make a production run.
• Have at least one machine operator and/or maintenance person available for instruction during
  Commissioning and test production run.
• Have upstream and downstream equipment in place and operational.

BPI is not responsible for delays caused by the above preparations being incomplete at the
time of arrival of its service technician. The customer will be billed according to the **BPI Commissioning, Service, and Training Rates** for such delays

Case 3:24-cv-00602-FDW-SCR   Document 1-1   Filed 06/28/24   Page 26 of 26